## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

TELESFOR VALLEJOS,

        Plaintiff,

v.                                   No. CIV 07-1226 LFG

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,

        Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Telesfor Vallejos ("Vallejos") invokes this Court's jurisdiction under 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner").  The Commissioner determined that Vallejos was not eligible for disability insurance benefits ("DIB").[1]  Vallejos moves this Court for an order reversing the Commissioner's final decision and remanding for a rehearing.  [Doc. 18.]

Vallejos was born on October 6, 1948 [RP 64] and was 58 years old when the administrative law hearing ("ALJ") was held. [RP 253.]  He completed the 5th grade and never attained a G.E.D. [RP 22.]  He is illiterate.  [RP 263.]  From July 7, 1966 to November 8, 1971, when Vallejos was 18 years old (or younger) through his early 20's, he was a patient at the Los Lunas Hospital and

---

[1]Vallejos did not apply for SSI benefits because he is receives a retirement pension from having worked for 25 years at Los Lunas Hospital and Training School.  [Doc. 67.]

Training School ("LLH&TS") in Los Lunas, New Mexico.[2]  [RP 212.]  According to Vallejos' later

retained attorney, LLH&TS was a State residential facility for the developmentally disabled then.

[RP 208.]  In one of the disability application forms, Vallejos stated that his parents placed him at

the LLH&TS because he was having as many as ten seizures a day.  [RP 77.]  He remained as a

resident in this state facility for many years.  In disability records filled out by Vallejos' sister-in-

law, Corinne Gallegos, who assisted him with the benefits application process, it is stated that

Vallejos "was place [sic] there by my family so I was trained to cut weeds and water trees under

supervision."  [Doc. 90.]  The description of "mentally retarded and disabled" was written on the

form by Corinne Gallegos after the name of Vallejos' employer, LLH&TS.  [Doc. 90.]  No records

exist of Vallejos' stay or treatment at LLH&TS because all records for that period were destroyed

in accordance with the facility's record retention policy.  [RP 87, 215.]   All that LLH&TS could

provide was a date Vallejos was admitted and a date he was discharged, and that he was employed

there.  [RP 212.]

        After his discharge from LLH&TS as a resident, Vallejos apparently was given a long-term

job on the grounds cutting grass and weeds.  [RP 263.]  He worked in the maintenance ground crew

as an "attendant."  [RP 69.]  Vallejos testified at the ALJ hearing that "a guy was with him at the

LLH&TS" and that he was taught how to chop weeds.  He worked in that position at LLH&TS for

25 years and retired in about 1997.  [RP 264.]  Vallejos testified at the hearing that he retired

because he was eligible to do so rather than because of any medical problems.  [RP 268.]  Since

retiring, Vallejos receives a retirement check from the State of New Mexico in the amount of $900

---

[2]Although Vallejos is illiterate, he provided the ALJ with some envelopes from his family to him at
LLH&TS, postmarked in the 1960's.  [RP 217-19.]  According to Vallejos' sister-in-law, Corrine Gallegos, Vallejos
claimed his mother placed him in LLH&TS for ten years, from 1961 to 1971.  [RP 90.]  Thus, he may have been a
patient at LLH&TS at the age of 13.  *See* discussion *infra* for a description of LLH&TS.

a month.  [RP 265.]  Although Vallejos attempted to find another job after he retired, he claimed no one would hire him because of his illiteracy.  He has not held any jobs other than the one at LLH&TS.

Vallejos and his wife live in Belen.  They have no children. [RP 112.]  Vallejos' wife is the sister of Corrine Gallegos.  According to Ms. Gallegos, Vallejos met his wife at LLH&TS during a union meeting.  [RP 277.]  Ms. Gallegos and her family live next door to the Vallejos, and they help the Vallejos a great deal.   [RP 275-79.]  Ms. Gallegos drives Vallejos or his wife to appointments in Albuquerque and outside the Belen area.  Vallejos has a driver's license and drives to the grocery store or to doctors' appointments within the Belen area.  [RP 261.] Vallejos' wife receives social security disability.  [RP 67.]  Ms. Gallegos testified at the ALJ hearing and referred to both Vallejos and his wife as "mentally challenged" or "mentally slow."  [RP 22, 278.]

On June 18, 2004, Vallejos filed an application for DIB.  [RP 17, 65.]  He did not have the assistance of counsel, and instead, appears to have been helped by Ms. Gallegos with the paperwork. He claimed the onset of his disability was December 31, 2002, but there are no contemporaneous medical records to confirm he was being treated for limitations or disabilities then.  The disability onset date of 12/31/02 is also the last date he was insured under the Social Security Act ("SSA"). [RP 19.]  Thus, Vallejos needed to show that he was under a disability within the meaning of the SSA before December 31, 2002, even though that same date is the onset date.

In his DIB application, Vallejos claimed to be disabled because of arthritis, back pain, stomach pain, illiteracy, and his prior history of having daily seizures.  [RP 69.]  In the initial denial of the claim, the agency stated "we were unable to obtain any of the required medical evidence necessary to decide your claim." [RP 46.]  "You say you are disabled because of right knee, hip and

back injuries, arthritis and high blood pressure." [RP 69.]  The agency attempted to obtain medical records for Vallejos from the Veteran's Administration, a doctor in Las Cruces and the William Beaumont Army Hospital in El Cruces, but there were no such records since Vallejos never served in the military.  [RP 96, 97, 101.]  The agency corrected its error and obtained some medical records for Vallejos from Presbyterian Healthcare Services in Belen, New Mexico.

In Vallejos' request for reconsideration, filled out by Ms. Gallegos, he claimed disabilities based on arthritis, back pain, illiteracy, high blood pressure, and ulcers.  This form explained Vallejos never served in the military and was instead, a client at LLH&TS.  [RP 45.]  Ms. Gallegos wrote on one of the forms that Vallejos needed to be evaluated because he suffered from arthritis, back pain, hypertension, depression and because it is "hard for him to understand a lot."  [RP 87.]

On January 10, 2005, the SSA case development notes indicate there was an error in the earlier requests for Vallejos' medical records and that it requested records for the wrong individual. The SSA's denial of the request for reconsideration on March 7, 2005, states that Vallejos alleged disabilities due to hypertension, arthritis and a "learning disability."[3]  [RP 129.]  Also on March 7, 2005, there is a Psychiatric Review Technique form that is signed by the Agency's psychiatrist noting that there was insufficient evidence to fill out the form.  Thus, the form is blank.  [RP 134.]

Vallejos's DIB application was denied at the initial and reconsideration stages [RP 34-41]. On May 31, 2005, Vallejos filed a request for hearing by the ALJ, stating he was "totally disabled and unable to work."  [RP 39.]  For the first time, this disability-related request was signed by an attorney.  [RP 29, 39.]  Vallejos, through counsel, wrote several letters to the ALJ, both before and

---

[3]It is unclear where Vallejos claimed that he had a "learning disability" or why this phrase appeared on some of the SSA's documentation.

4

after the ALJ hearing, asking that the ALJ order a consultative exam to test Vallejos' mental functioning.  [RP 94, 208.]

An administrative hearing was held in Albuquerque on November 7, 2006. [RP 253.]  In a decision, dated February 23, 2007, the ALJ rejected counsel's request for a consultative exam and further found that Vallejos was not disabled within the meaning of the SSA.  Thus, Vallejos' DIB application was denied.  [RP 17-24.]  Vallejos challenged this determination to the Appeals Council which denied his request for review on October 1, 2007.  [RP 3.]  This appeal followed.

## Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[4]  The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining his burden at each step, the burden then shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[5]

At step one, claimant must prove he is not currently engaged in substantial gainful activity;[6] at step two, the claimant must prove his impairment is "severe" in that it "significantly limits his physical or mental ability to do basic work activities . . . .,"[7] at step three, the Commissioner must conclude the claimant is disabled if he proves that these impairments meet or are medically

---

[4]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[5]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[6]20 C.F.R. § 404.1520(b) (1999).

[7]20 C.F.R. § 404.1520(c) (1999).

equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[8] and, at step four, the claimant bears the burden of proving he is incapable of meeting the physical and mental demands of his past relevant work.[9]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's residual functional capacity ("RFC"),[10] age, education and past work experience, he is capable of performing other work.[11]  If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove he cannot, in fact, perform that work.[12]

## Standard of Review and Allegations of Error

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992); Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).  The Court's review of the Commissioner's determination is limited.  Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court's function is to determine whether the record as a

---

[8]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means his impairment is "severe enough to prevent him from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[9]20 C.F.R. § 404.1520(e) (1999).

[10]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[11]20 C.F.R. § 404.1520(f) (1999).

[12]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied.  Id. at 1497-98.  In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.  Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted).  If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.  The Court cannot re-weigh the evidence or substitute its judgment for that of the Commissioner.  Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

Here, the ALJ determined at step two of the five-step evaluation process that Vallejos' impairments were not "severe."  In reaching this decision, the ALJ made the following findings: (1) Vallejos last met the insured status requirements of the SSA on December 31, 2002 (the date of onset); (2) he did not engage in substantial gainful activity "during the period from his alleged onset date of December 31, 2002, through his date last insured of December 31, 2002;" (3) through the date of last insured, Vallejos had the following medically determinable impairments: hypertension ("HTN"), obesity, gastroesophageal reflux disease ("GERD"), early macular degeneration, and degenerative changes in the left knee and thoracic spine; (4) through the date of last insured, Vallejos did not have an impairment or combination of impairments that significantly limited his ability to perform basic work-related activities for 12 consecutive months; therefore, he did not have a severe impairment or combination of impairments (at step 2 of the evaluation process); and (5)

Vallejos was not under a disability "at any time from December 31, 2002, the alleged onset date, through December 31, 2002, the date last insured."  [RP 19-24.]

In this appeal, Vallejos asserts that the case must be reversed and remanded because the ALJ improperly refused at least two requests to conduct psychological/IQ evaluations of Vallejos, disregarded the alleged fact that Vallejos is mentally retarded, failed to find that Vallejos' condition was "severe" at step 2, failed to find his condition met listing requirements at step 3, and erred by failing to adequately develop the record.  [Doc. 19, pp. 2-3.]

### ALJ's Discussion of Medical Records and History

There are a few medical records in this case concerning Vallejos' physical condition from 1994, 1997, 1999, 2001, 2002, 2003, 2004, and 2005.  There are additional medical records from 2006, including a Medical Source Statement of Ability to Do Work-Related Activities for Social Security Disability, filled out by Dr. Roland Sanchez, who did not appear to be a treating physician. on the date he filled out the Medical Source Statement.  *See* discussion *infra*.  There are no other medical records that were supplied showing Dr. Sanchez examined Vallejos in 2006.

In the decision, the ALJ provided a detailed review of Vallejos's medical history and treatment notes that are part of the record.  [RP 19-20.]  Indeed, the ALJ carefully and thoroughly summarized the key medical records and alleged physical limitations.  He properly noted that most, if not all, of Vallejos' physical ailments are well controlled by medications, e.g., hypertension and GERD.  [RP 110, 111, 114, 115, 117.]  In addition, the ALJ appropriately observed that medical testing of Vallejos' physical conditions concerning his back and knee pain showed minor abnormalities or mild degenerative changes.  [RP 125, 128, 153, 155, 162, 163, 166, 232, 234, 237, 240, 249, 252.]  Some of the same medical records reflected that Vallejos was not suffering from

8

pain or that the pain was controlled with medications.  [*See id.*]  Various medical records, as noted by the ALJ, indicated that Vallejos was "feeling well" after problems with his stomach or breathing, or had "no complaints."  [RP 107, 112, 226, 244, 252.]  Vallejos had some eye problems and possibly early macular degeneration but denied visual complaints, and the testing of his vision appeared to be generally normal.  [RP 236.]  There never appeared to be written confirmation from an eye specialist that Vallejos had macular degeneration.

In his written decision, he ALJ carefully explained why he discounted the Medical Source Statement filled out by Dr. Roland Sanchez on July 31, 2006.  [RP 20, 184-87.]  The ALJ stated that the Medical Source Statement is the only form provided that gives a medical diagnosis of "retardation."  The ALJ found that the diagnosis was not consistent with Vallejos' work history and "adaptive functioning," i.e., Vallejos' 25 years of full-time work for the State, his retirement and pension, his earnings that were above the level of substantial gainful activity, the fact that Vallejos is married, and has a driver's license and drives.  [RP 20.]  The ALJ further noted that none of the physicians who saw Vallejos on a more frequent basis through 2005 indicated that Vallejos was unable to work or had any specific limitations.  [RP 24.]  None of those physicians who examined Vallejos before 2005 and even in 2006, discussed in the medical records any limitations in Vallejos' mental functioning or alleged retardation.  The ALJ observed that Dr. Sanchez provided no clinical or laboratory findings to support his opinion and apparently only saw Vallejos once or twice.  [RP 24.]

Based on the medical evidence that is part of the record, the Court finds substantial evidence exists to support the ALJ's decision at step 2 of the sequential evaluation process that none of Vallejos' physical conditions significantly limited his ability to perform basic work-related activities

9

for 12 consecutive months and therefore, that the alleged physical impairments were not "severe." [RP 20.] Moreover, the ALJ provided an appropriate and adequate explanation as to why he gave "little weight" to Dr. Sanchez's opinions on the Medical Source Statements.

Dr. Sanchez's physical Medical Source Statement would be of little assistance to anyone who was attempting to evaluate Vallejos' condition. In the form, Dr. Sanchez primarily checked off boxes and provided minimal explanations for his determinations. [RP 184.] For example, the first question states: "In the course of your treatment, have you limited his/her ability to work in any way?" [RP 184.] Dr. Sanchez checked off "yes," but never explained what the "course of his treatment" was since there are no other medical records showing he had seen Vallejos or conducted any type of examination. Dr. Sanchez found that Vallejos was limited in his ability to lift or carry objects and that he could not lift more than 10 pounds occasionally. The medical basis for that opinion is scribbled on the form and is mostly illegible. It may say osteoarthritis. The rest is illegible. [RP 184.] Dr. Sanchez found that Vallejos' standing or walking was limited to no more than 2 hours per day and described his gait as "stumbles." The medical basis for the limitation, to the extent it can be deciphered, is arthritis post trauma to one of Vallejos' legs. [RP 185.] Dr. Sanchez determined that Vallejos was limited to less than 2 hours of sitting because of "anxiety retardation." [RP 185.] Vallejos was limited in his ability to reach overhead, handle objects and travel because of "retardation, poor judgment and macular degeneration." [RP 185.]

On the mental Medical Source Statement, Dr. Sanchez concluded that Vallejos had extreme limitations in every category, e.g., ability to understand and remember short, simple instructions, carry out short, simple instructions, etc. Dr. Sanchez provided no medical/clinical findings to support those limitations. [RP 186.] Similarly, Dr. Sanchez found extreme limitations in every

10

category regarding Vallejos' ability to interact appropriately with others at work and to respond appropriately to pressure at work.  With respect to support for this assessment, Dr. Sanchez left the space blank.  [RP 187.] Regarding the question of whether there were any other capabilities affected by Vallejos' limitation, Dr. Sanchez wrote the word "judgment" under the topic of "capability" and then "poor judgment" under the category of "effect."  The medical/clinical findings to support that assessment were: "medical interview."  [RP 187.]

Standing alone, Dr. Sanchez's mental medical source statement has very little value.  But, considering it along with Vallejos' illiteracy, his five to ten year inpatient residential stay at LLH&TS during his youth, his subsequent long association with LLH&TS as a menial laborer, the general purpose and role of LLH&TS, and Vallejos' inability to obtain any of his LLH&TS records through no fault of his own, the Court is convinced that this case should be remanded.  Upon remand, the ALJ can recontact Dr. Sanchez for supplemental information, require a consultative mental health examination of Vallejos, including IQ testing, and call upon the services of a medical advisor to assist with establishing a disability onset date, should a disability be found.

### Discussion

This case is made difficult by what the record does not contain, i.e., the reasons Vallejos was placed in LLH&TS for five to ten years, the diagnoses he received there, the treatment he was given, and how the 25 years of menial work at LLH&TS more than likely related to Vallejos' mental condition or diagnosis.

Vallejos provided undisputed evidence that he was placed at LLH&TS by his parents during his youth, either at age 13 or 18, or perhaps at both ages for a period of years.  He was placed at LLH&TS because of a seizure condition.  It is uncontested that Vallejos spent at least five years at

the facility as a resident, and perhaps more years as an inpatient.  The mere fact of placement at this

facility raises a red flag.

In an unrelated written decision by the Tenth Circuit Court of Appeals, near the time Vallejos

was a patient at LLH&TS, the Court described LLH&TS as follows:

> The Los Lunas Hospital and Training School is an institution created
> by statute and is operated and maintained by the State of New
> Mexico 'for the care, custody, employment, education and training
> of mental defectives.' N.M. Stat. Ann. § 34-3-2

State v. Equitable Life Assur. Soc. of U.S., 447 F.2d 620, 621 n. 1 (10th Cir. 1971).  In a later

District of New Mexico opinion, the trial court described LLH&TS as one of two state operated

institutions classified as Intermediate Care Facilities for the Mentally Retarded under Title XIX of

the Social Security Act.  Jackson by Jackson v. Fort Stanton Hosp., et al., 757 F. Supp. 1243, 1249,

n. 1 (D.N.M. 1990), *rev'd in part on other grounds*, 964 F.2d 980 (10th Cir. 1992.)  The district

court also referred to LLH&TS as a state supported institution for the developmentally disabled in

New Mexico.  Id.   "Developmentally disabled" was defined by the court as a "general category of

disorders usually first evident in infancy, childhood or adolescence including mental retardation."

Id.

In a more detailed description of LLH&TS, the Court in Jackson stated:

> LLH&TS was established by act of the New Mexico Legislature on
> March 20, 1925 as a public residential facility for "any person
> mentally underdeveloped or faultily developed" who "requires
> supervision, care and control for his own welfare, or for the welfare
> of others, or for the welfare of the community."  The institution was
> named "The Home and Training School for Mental Defectives."
> 1925 New Mexico Laws 254, Ch. 133, §§ 1, 2.  LLH&TS is located
> in Los Lunas, New Mexico and currently serves 345 residents.  Of
> those, 193 are in wheelchairs, 226 have a seizure disorder, 77 have
> a hearing impairment, 109 have a vision impairment, 40 have both a
> vision and hearing impairment and 72 are on psychoactive

> medication in conjunction with a behavioral problem.  Approximately
> seventy-two percent (72%) of the population of LLH&TS
> are profoundly retarded and twenty-one percent (21%) are severely
> retarded.  Tr. 4/27/90 at 17-18 (LaCourt).

Jackson, 757 F. Supp. at 1255.  Thus, it is likely that due to his prolonged stay at this facility,

Vallejos was deemed a "mental defective," "mentally retarded," "developmentally disabled,"

"mentally underdeveloped," or "faultily developed," and required "supervision, care and control for

his own welfare, or the welfare" of others.

     Although Vallejos was not one of the class members affected by the court's decision in

Jackson [RP 212] (Vallejos was "not a Jackson class member because [he was] released prior to the

Jackson lawsuit"), there is no reason to believe that Vallejos was a resident at LLH&TS for five to

ten years for reasons other than a developmental disability.  The facility specifically treated the

"mentally undeveloped or "faultily developed" or "developmentally disabled."  Moreover, although

the Court is not authorized to make any findings about the relation between seizures and mental

retardation, it is clear from court opinions, including Jackson, that seizures may occur with

retardation.  *See, e.g.,* Jackson, at 1253, 1255.

     The fact that Vallejos was discharged from LLH&TS and then proceeded to perform menial

work there for 25 years before receiving a retirement pension from the State of New Mexico does

not rule out that he was developmentally disabled or that his present mental ability is in question.

First, Vallejos did not leave LLH&TS to work for an independent employer.  He continued to work

at LLH&TS, and he did menial labor under supervision.  The work performed by him after his

release as a resident is more or less the same weed-cutting work Vallejos performed as a resident.

[Doc. 90.]

The only form provided by LLH&TS in relation to Vallejos' request for records states "work leave, employed at LLH&TS."  In addition, LLH&TS clearly contemplated employment training for its patients who were able to function more independently.  *See* State v. Equitable Life, 447 F.2d at 621 n.1.  In Jackson, the trial court observed that the school was required to provide programs for mentally retarded patients that assisted the individual to live independently.  Jackson, 757 F. Supp. at 1265.

Last, there are no treatment or employment records for Vallejos because of the institution's document retention policy.[13]  Thus, through no fault of Vallejos, he is unable to provide objective medical evidence of his possible diagnoses, treatment and evaluation for a period of thirty to thirty-five years.  In addition, the fact that mental disabilities often carry with them serious and negative societal stigma, particularly during the years when Vallejos was an inpatient at LLH&TS, raises questions regarding the level of Vallejos' mental functioning, even if he does not expressly claim to be mentally "slow" or "challenged" as alleged by his sister-in-law.

## DEVELOPMENT OF THE RECORD

The ALJ has an affirmative obligation to develop the administrative record, even when the claimant is represented by counsel.  Baker v. Bowen, 886 F.2d 289, 292 n.1 (10th Cir.1989) (*per curiam*).  If evidence from a claimant's treating doctor is inadequate to determine if the claimant is disabled, the ALJ must recontact a medical source to determine if additional needed information is readily available.  *See* 20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1) and 404.1512(f) ("We will seek additional evidence or clarification from your medical source when the report from your medical

_____

[13]LLH&TS apparently ceased to function as a home for the developmentally disabled in the late 1990's or early 2000's.  Protection and Advocacy System, Inc. v. Presbyterian Healthcare Serv., 128 N.M. 73, 74 (Ct. App.), *cert. denied,* 128 N.M. 148 (1999).  Thus, the difficulty in obtaining documentation is exacerbated by the fact that state facilities like this and other state insane asylums were closed.

source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.")  *See also* McGoffin v. Barnhart, 288 F.3d 1248, 1252 (10th Cir. 2002) (holding ALJ had an obligation to recontact treating physician if the validity of his report open to question).  "The responsibility to see that this duty is fulfilled belongs entirely to the ALJ; it is not part of the claimant's burden."  Robinson v. Barnhart, 366 F.3d 1078, 1084 (10th Cir. 2004) (*citing* White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2001)).

Here, with respect to Vallejos' attorney's requests that the ALJ require intelligence testing, the ALJ stated that a "[r]eview of the medical records for the period through December 31, 2002 contains no evidence of any mental impairment.  That is, the claimant was not diagnosed as having any mental impairment."  [RP 20.]

First, "[t]he absence of evidence is not evidence."  *See* Thompson v. Sullivan, 987 F.2d 1482, 1491 (10th Cir. 1993) (discussing positions or duties that applicant could still perform).  This is especially true here where no records were available from the LLH&TS for a period of 30-35 years, even though Vallejos was treated there for five to ten years and worked there for 25 years.  It simply cannot be said with any certainty that Vallejos was never diagnosed with a mental impairment, even if this record fails to include objective medical evidence of the diagnosis.  An inpatient stay at LLH&TS, alone, should have been a red flag to the ALJ regarding the need to develop the record as to Vallejos' level of mental functioning and whether there may be a serious impairment at step two where only a *de minimis* showing is necessary.  Moreover, the fact that an individual may not suffer severe symptoms at times or that the claimant is able to do work at times does not automatically mean that the impairment is non-severe or that there is no impairment.  "Given the

unpredictable course of mental illness, '[s]ymptom-free intervals and brief remissions are generally of uncertain duration and marked by the impending possibility of relapse." Black v. Barnhart, 237 F. Supp. 2d 1099, 1107, 1108 (S.D. Iowa 2002) (internal citation omitted); *see* Roberts v. Callahan, 971 F. Supp. 498, 501 (D.N.M. 1997) (mentally ill claimants can have symptom free intervals, and their ability to work at times does not mean the impairment is not severe).

With respect to ordering consultative examinations, the ALJ has broad latitude in making such decisions.  Hawkins v. Chater, 113 F.3d 1162, 1166 (10th Cir. 1997).  There must be some objective evidence in the record suggesting that the existence of condition might have a material impact on the disability decision.  Id. at 1167.  The Court concludes here that the evidence in the record regarding Vallejos' inpatient stay at LLH&TS, along with his long employment history there, was sufficient to suggest the existence of a mental impairment that might have a material impact on the disability decision.

Moreover, the medical source statement (mental) from Dr. Sanchez, while understandably discounted by the ALJ, along with Vallejos' history at LLH&TS, should have triggered the need for either a consultative exam, testing of Vallejos mental functioning and/or recontacting Dr. Sanchez to request the basis or support for his findings.  The validity of Dr. Sanchez's report and findings of extreme limitations, without any explanations, certainly left the report "open to question."  The ALJ has an affirmative duty to answer those questions in cases such as this.

Thus, upon remand, the ALJ should obtain a consultative exam concerning Vallejos' mental functioning and an IQ test, if that is appropriate.  In addition, the ALJ should recontact Dr. Sanchez and request support for the findings or limitations he described in his medical source statement (mental).

16

Based upon this new or additional medical information, should the ALJ determine that a disability exists, he should consult a medical expert to determine the onset date of disability. "In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working." Anderson v. Apfel, 2000 WL 913666 at *4 (D. Or. Mar. 25, 2000) (*citing* SSR 83-20). "Where a record is ambiguous as to the onset date of disability, the ALJ must call a medical expert to assist in determining the onset date." Id. at *5 (internal citation omitted).

> Because mentally ill persons may not be capable of protecting themselves from possible loss of benefits by furnishing necessary evidence concerning onset, development should be undertaken in such cases to ascertain the onset date of the incapacitating impairment.

SSR 83-20 at *5 (1983) (Onset of Disability).

In sum, the Court concludes that there was not substantial evidence to support the ALJ's finding that no testing of Vallejos' mental functioning or IQ was required. On remand, the Court clarifies that its directions relate only to alleged mental impairments. The Court agrees that substantial evidence supports the ALJ's findings that none of Vallejos' physical impairments, as alleged, were severe at step two.

17

**<u>Conclusion</u>**

The Court grants Vallejos's motion to remand for a rehearing [Doc. 18] as described herein.

The matter is remanded for proceedings consistent with this Court's Order.


*Lorenzo F. Garcia*
_____
Lorenzo F. Garcia
Chief United States Magistrate Judge